**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0343-22

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

PAIGE A. PFEFFERLE,
a/k/a PAIGE ALEXANDRA
PFEFFERLE,

    Defendant-Respondent.

_____

Argued October 23, 2023 – Decided December 27, 2023

Before Judges Gilson, DeAlmeida, and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 11-08-1884.

Natalie A. Schmid Drummond, Assistant Prosecutor, argued the cause for appellant (Grace C. MacAulay, Camden County Prosecutor, attorney; Natalie A. Schmid Drummond, of counsel and on the briefs).

David Jay Glassman argued the cause for respondent.

PER CURIAM

In 2013, a jury convicted defendant Paige Pfefferle of first-degree murder and three related crimes. On the murder conviction, she was sentenced to the mandatory minimum term of thirty years in prison without the possibility of parole. N.J.S.A. 2C:11-3(b)(1). On direct appeal, we affirmed her conviction, State v. Pfefferle, No. A-1995-13 (App. Div. Jan. 15, 2016), and the Supreme Court denied certification, 224 N.J. 529 (2016).

Defendant filed a petition for post-conviction relief (PCR), and the PCR judge granted her an evidentiary hearing. The PCR judge found that defendant's trial counsel had been ineffective because he failed to show defendant a March 8, 2013 letter offering her the chance to plead guilty to first-degree aggravated manslaughter with a recommended sentence of eighteen years. The judge also found that defendant was prejudiced because the failure to communicate the plea offer "caused a change in the outcome of this case because the deficiency led to defendant's sentence of [thirty] years without the possibility of parole compared to the plea offer of [eighteen] years subject to [the No Early Release Act]." The PCR judge then ruled that he would remedy the ineffective assistance by vacating defendant's murder conviction and allowing defendant to now accept the offer and plead guilty to first-degree aggravated manslaughter.

A-0343-22

The State appeals from the August 31, 2022 order granting defendant's PCR petition and the September 28, 2022 order denying reconsideration. We reverse and vacate both orders. A review of the record establishes that there is insufficient evidence to support the finding that trial counsel failed to show the March 8, 2013 plea offer to defendant. On that ground, we would normally remand for a new evidentiary hearing. A remand, however, is not necessary because defendant cannot establish prejudice.

Defendant now wants to plead guilty to aggravated manslaughter. At trial, defendant testified that the victim's death was an accident: she claimed he fell onto a knife she was holding in self-defense. To plead guilty to aggravated manslaughter, defendant would have to change her testimony and admit that she acted recklessly, meaning she consciously disregarded a substantial and unjustifiable risk that the victim's death would result from her conduct. N.J.S.A. 2C:11-4(a)(1); Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter" at 6 (rev. June 8, 2015). A court cannot accept that change in testimony because defendant would be lying if she now tried to plead guilty to aggravated manslaughter. We, therefore, reverse and vacate the August 31, 2022 order granting defendant's petition for PCR and the September 28, 2022 order denying reconsideration.

3

I.

In the early morning hours of September 4, 2010, police were dispatched after being notified of a 911 call relaying that Matthew Hus had passed out in defendant's family home. When the police arrived, they found Hus lying face up on the kitchen floor without a pulse. After being administered emergency medical aid, Hus was taken to the hospital, where he was pronounced dead.

At the scene, defendant gave varying statements about what happened to Hus. She told one family member that Hus had just collapsed. She told an officer that she and Hus had been arguing and he had collapsed. She added that Hus might have hit his chest on something "because it could happen." Defendant told another officer that she and Hus were arguing, she started to cry, and Hus collapsed.

As the police and others were administering emergency medical aid to Hus, they saw that Hus had a stab wound in his chest and there was blood on his shirt. Officers then found a knife in a butcher block on the kitchen counter with blood on the knife's blade. Subsequent DNA testing showed that Hus' DNA was on the blade and defendant's and Hus' DNA were on the knife handle.

Defendant was taken to police headquarters and interrogated. She first told the police that she and Hus had been arguing, they both started crying, and

4

Hus unexpectedly fell. Later in the interrogation, defendant stated that Hus had called her a liar, she began to cry, and she grabbed a knife. Hus then came towards her, and he walked into the knife. Defendant also told the police that she put the knife back into the holder because "it didn't look like there was any . . . blood on it," and she "didn't think anything happened."

Thereafter, defendant was indicted for four crimes: first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); and third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1).

Before trial, the State made at least two plea offers. At a pretrial conference conducted on August 27, 2012, the court questioned defendant regarding her understanding of the potential sentence she faced, and the plea offer the State had made. The court informed defendant that if she were convicted of first-degree murder, she faced a maximum sentence of life in prison with sixty-seven and a half years of parole ineligibility. Defendant acknowledged that she understood that potential sentence. Defendant also acknowledged that she was aware that the State had offered her a plea with a recommended sentence of twenty-five years subject to the No Early Release Act

(NERA). The court explained that, under that plea, defendant would serve a minimum sentence of twenty-one years and three months before she became eligible for parole, and defendant testified that she understood the plea offer. Defendant testified that she had rejected the plea offer and wanted to go to trial.

At a pretrial conference conducted on February 4, 2013, the State extended a plea offer that would further reduce defendant's sentence. The State offered to allow defendant to plead guilty to aggravated manslaughter with a recommended sentence of eighteen years in prison subject to NERA. That offer was confirmed in a letter, dated March 8, 2013, sent to defendant's counsel. The letter also assessed the strength of the State's case and the weaknesses in defendant's anticipated defenses.

On September 9, 2013, the court conducted a pretrial hearing to address, among other issues, the admission of defendant's statements to the police. At that hearing, where defendant was present, the court asked the assistant prosecutor and defense counsel if the case could be resolved. The following exchange occurred:

> THE COURT: Okay. Counsel[,] let me ask you a question again. I've not pressed on this in any way. Is there any talking between counsel whether or not the case can be resolved in any way other than through trial?

[Assistant Prosecutor] MS. TESTA: No. I mean, Your Honor, the State made an offer to aggravated manslaughter. I believe the last number was [eighteen] years. [Defense counsel] Mr. Kaigh indicated that his client would only plead to reckless manslaughter. The State is not willing to give an offer in the five to ten year range, so no.

THE COURT: Okay. Is there any way we can work something out by way of a cap?

MS. TESTA: It would have to be to aggravated manslaughter in that range.

THE COURT: Assuming it's to aggravated manslaughter. Can we put a cap on it?

MR. KAIGH: I don't think so, Judge.

THE COURT: Okay.

MR. KAIGH: The negotiation posture was if she would plead to anything the most it would be was open to passion provocation manslaughter.

THE COURT: Okay. But of course there's no basis for it in that tape.

MR. KAIGH: Not in that tape, no.

THE COURT: Okay. Thank you counsel. We'll see you tomorrow morning then.

Defendant did not enter a guilty plea and the matter proceeded to trial in September 2013. At trial, the State introduced and played for the jury defendant's statements to the police on the day of Hus' death. The State also

7

called various police officers who responded to the Pfefferles' home. Those officers testified about the varying statements defendant had given to them.

The State also called a medical examiner who had conducted a post-mortem examination of Hus' body. The medical examiner testified that Hus had been stabbed and had a wound on the left side of his chest. The examiner explained that the stab wound had passed two and a half inches to three inches downward into Hus' body and had pierced Hus' heart chamber. The medical examiner explained that the wound had a downward angle of forty-five degrees. The examiner went on to opine that the injury was not self-inflicted and was not the result of an accident. Instead, the examiner opined that Hus had been stabbed by another person in an overhand thrust in a downward motion.

Defendant also testified at trial. She testified that Hus had been controlling and abusive during their relationship. She stated that Hus had slapped her in the face at least 100 times, had struck her with a tire iron, and had struck her with the claw end of a hammer. Defendant also testified that the abuse always occurred in private when no one else was around and that the level of abuse progressed over time.

Concerning September 3 and 4, 2010, defendant explained that she and Hus had recently broken off their relationship, but in August 2010, they had

A-0343-22

unprotected sex. On the night of September 3, 2010, she had told Hus that she might be pregnant. According to defendant, she and Hus got into an argument and Hus threatened to tie her up and throw her in the Delaware River. Defendant described Hus as being angry and said that he was moving towards her as he threatened her. She claimed that she picked up a knife because she thought Hus was going to kill her. Defendant went on to testify that as Hus came towards her, he slipped on some liquid on the floor and fell into the knife, which she was holding in her right hand by her side. In that regard, defendant testified in part as follows:

> Q     Paige, did you pick a knife up?
>
> A     I did.
>
> Q     Why?
>
> A     Because I thought he was going to kill me.
>
> Q     There's been a lot of talk during this trial that you witnessed about a downward stabbing motion, did you engage in any downward stabbing motion?
>
> A     No.
>
> . . . .
>
> Q     Why don't you tell us what really happened?
>
> . . . .

9

A    He—he was coming at me and that's when I picked up the knife, and he stumbled into the knife.

Q    When you say, "he stumbled," did you see what he stumbled on?

A    There was liquid on the floor.

Q    Do you know that because you've seen the pictures since then?  Or, did you know it that night?

A    No, I knew it that night.

Q    When you say he stumbled, was he coming at you?

A    Yes, he was coming at me.

Q    This was after he had just said what?

A    He was going to tie me up and throw me in the Delaware River.

Q    Did you take that to mean he was going to kill you?

A    Yes.

Q    So, when he stumbled forward, what happened to him?

A    He came into the knife.

Q    How were you holding the knife?

A    By my side.

A-0343-22

Q    Can you get up and show us so I can compare it to the videotape?

A    (No verbal response given.)

Q    Holding it at your waist?

A    Mm-hmm.

Q    In your right hand?

A    Yes.

Q    And, you said he fell into you?

A    Yes.

Defendant told the jury that at first, she did not know that the knife went into Hus.  She also testified that she did not intend to kill Hus and had picked up the knife to defend herself.  She testified that she had believed the degree of force was necessary because of what Hus had said he would do to her and what he had done to her in the past.  In that regard, defendant testified:

Q    . . . . Did you intentionally stab Matt Hus?

A    No, I did not.

Q    Was it your intent to kill him?

A    No.

Q    When you picked the knife up, you've told us your intent to defend yourself.

A     Yes.

Q     In your mind, you needed to use that degree of force?

A     I believed so that night.

Q     Why?

A     Because of, I mean, what he said, and the way he said it.

Q     And, what he had done in the past?

A     And, what he had done in the past.

After considering all the evidence and testimony, the jury found defendant guilty of all charges, including first-degree murder. Defendant was sentenced on November 15, 2013. On the murder conviction, the court sentenced defendant to the mandatory minimum term of thirty years in prison without the possibility of parole for thirty years. One of the weapons offenses was merged with the murder conviction, and the sentences on the other charges were run concurrent to the sentence for the murder conviction.

Defendant filed a direct appeal challenging her conviction on numerous grounds. We rejected those arguments and affirmed defendant's conviction and sentence. Pfefferle, slip op. at 2. Thereafter, the Supreme Court denied defendant's petition for certification. Pfefferle, 224 N.J. at 529.

In May 2018, defendant filed a PCR petition with the assistance of counsel. In support of her application, defendant submitted a verified petition and certification, as well as certifications from family members and friends. Defendant contended that her trial counsel had been ineffective in representing her "throughout every step of the process leading to her trial and conviction." Among other contentions, defendant asserted: "Mr. Kaigh urged [defendant] to reject without explanation an [eighteen-]year plea offer with the State and instead take her case to trial on the grounds that at the time of [Hus'] stabbing, [defendant] was suffering from Battered Woman Syndrome."

The judge who had overseen the trial was not available, so all proceedings concerning the PCR petition after the first hearing were considered by another judge. On September 30, 2020, after hearing argument, that judge granted an evidentiary hearing. In doing so, the PCR judge indicated that he was granting the evidentiary hearing primarily to address whether defendant's trial counsel had communicated the plea offers to defendant and her family.

By the time the evidentiary hearing was granted, defendant's trial counsel had passed away. Consequently, the State moved to compel access to trial counsel's file. Eventually, the PCR judge conducted an in camera review of that

A-0343-22

file and relevant portions of the file were produced to the State, but not until after the evidentiary hearing.

The PCR evidentiary hearing was conducted over three days in the summer of 2021: June 16, July 28, and August 13, 2021. Defendant, her mother, her father, her grandfather, and seven of her other family members and friends testified in support of the petition. Defendant and her witnesses all testified on the first two days of the hearing. Those witnesses explained that the family had retained Kaigh to represent defendant and that defendant and some family members met with Kaigh weekly throughout the pretrial period.

Defendant's mother and father testified that Kaigh always assured them that defendant would not be convicted. They also testified that Kaigh never told them that the State had made plea offers, or if a plea offer was mentioned, Kaigh told them that he would not let defendant plead guilty because she was not going to be convicted at trial.

Defendant's grandfather also testified that Kaigh always assured the family that defendant would not be convicted. For example, he testified: "Again, [I] hate to sound like a broken record, but that's exactly what he said. 'There is no way [defendant is] gonna take a plea because [defendant is] not gonna serve one day.'"

Defendant testified that she was nineteen years old at the time of Hus' death and that she relied on Kaigh and her family for guidance and advice. She testified that she could not recall Kaigh communicating that she should enter a guilty plea and accept the State's offer. Specifically, in that regard, she testified:

> Q    Okay. Do you recall any train of thought that was communicated by [Kaigh] that ended up with you entering a guilty plea and accepting a State's offer?
>
> A    No, he said I was never going to take a plea.

Defendant went on to explain that she relied, in particular, on her grandfather, and because her grandfather never expressed a concern, she did not consider taking a plea offer. Defendant also explained that Kaigh always assured her that no one would ever convict her and that she should not accept the State's plea offers.

On cross-examination at the evidentiary hearing, defendant confirmed that her testimony at trial had been truthful. She expressly confirmed that her testimony concerning Hus's abuse and that she had not intentionally stabbed Hus was truthful.

When defendant was asked if she would have taken a plea to an eighteen-year sentence, her answer was equivocal. First, she testified that she never said that she would take such a plea. Thereafter, she stated that she did not have any

A-0343-22

intentions concerning taking a plea, but if her family had wanted her to take a plea, she would have plead guilty. In that regard, defendant testified in relevant part:

Q   So did you testify to the jury that those things were true, or let me rephrase that. Did you testify to those things because these are events that actually took place?

A   Yes.

Q   Okay. So in other words, you did not intentionally kill this man?

A   No.

Q   Okay. Can you explain to me then how it is that if you're saying you didn't intentionally kill anybody, that somebody's threatening you and then kind of falls on your knife, how is it that you're now saying if I'd known the offer was [eighteen], I would have taken an [eighteen]. Do you see how those two things don't really add up?

A   Who said I would have taken it?

Q   So you would not have taken [eighteen]?

A   I never said I would have taken a plea.

Q   Okay.

A   I don't even know where that—when that came into the discussion.

A-0343-22

Q    Okay.  Was it your intention based on the defense that you had, your intention was to proceed to trial?

A    I didn't have any intention.

. . . .

Q    Here's what I'm saying.  What I'm saying is, your testimony now is testifying to the same thing you testified at trial which is, you didn't stab him, so therefore you're saying you could not and would not have admitted under oath to stabbing him as part of a guilty plea?  You follow?

A    Well, I—it was an accident.

Q    Sure.

A    However, I know that I'm the one who did it, so if there was—if there was a plea that my family wanted me to take, I would have taken it.

Q    You realize that's the exact opposite of what you just said about a minute ago, right?  Where you said, I never would have pled—who said I wanted to plead—who said I wouldn't have done that, do you remember saying that?

A    Because you said that I said that I would have taken a plea.

Q    But then you said you would not have.

A    Because that was never the course of action.  You said what my intentions were, and I didn't have any intentions of going into this in any way, shape or form.

17

However, if my family wanted me to take a plea, I would have taken a plea.

On the third and final day of the PCR evidentiary hearing, the State called its only witness: Kelly Testa, the assistant prosecutor who tried the case. While questioning Testa, the State introduced the March 8, 2013 letter in which the Prosecutor's Office confirmed the plea offer it had made in early 2013 for defendant to plead guilty to first-degree aggravated manslaughter in exchange for a recommended sentence of eighteen years in prison subject to NERA. Neither defendant nor any of her witnesses at the PCR hearing were shown that letter or questioned about that letter.

On August 31, 2022, a year after the evidentiary hearing had closed, the PCR judge granted defendant's petition, explaining his reasons on the record, and entering an order. In his oral opinion, the PCR judge made it clear that he was basing his ruling on the March 8, 2013 letter. He explained that that letter was a "game-changer" because:

> The focus of my decision as to whether it's ineffective assistance of counsel is the testimony of the defendant and [the] various witnesses concerning what Mr. Kaigh said and how he said it in regards to resolving the case, as well as the receipt or specifically as I find, the non-receipt and non-communication of this letter which this defendant, I find, never had. She never had it.
>
> . . . .

18

> The focus of the issue is this lawyer receiving the letter and nobody sees it but him. Certainly I find that that meets the first prong in regards to Strickland as an absolute dereliction of his duty and an unprofessional error.

The PCR judge went on to state that he was also relying on defendant's and her witnesses' testimony that when any discussion of a plea arose, her counsel always assured defendant and her family that he would not let defendant take a plea because she would do better by going to trial.

Addressing the prejudice, the PCR judge reasoned that defendant would have accepted the plea of eighteen years subject to NERA:

> I find that that is a reasonable probability and if this family and particularly this defendant and this client had been presented with that letter, it would have led to a different decision. . . .
>
> . . . .
>
> What would have been the different outcome? Instead of [thirty] do [thirty], it's likely that she would have taken [eighteen] with [eighty-five] percent no early release. So that's my decision. I feel that the petitioner has proven her case by a fair preponderance of the evidence.

The State filed a motion for reconsideration, contending that defendant could not truthfully plead guilty to aggravated manslaughter given her testimony at trial. The PCR judge heard argument on that motion. On September 28, 2022,

the judge denied the State's motion for reconsideration, explaining his reasons on the record and issuing a written order. At that hearing, defendant, through her counsel, made it clear that she was not seeking a new trial. Instead, defendant was asking the court to allow her to vacate her jury conviction of murder and enter a plea of guilty to first-degree aggravated manslaughter.

In denying the motion for reconsideration, the PCR judge elaborated on his reasons for granting the petition. The PCR judge reiterated the reasons he articulated on the record and then rejected the State's argument that defendant could not truthfully plead guilty to aggravated assault given her testimony at trial. The judge reasoned that defendant's testimony at trial was in support of her affirmative defense of self-defense based on Battered Woman Syndrome. The judge reasoned that because he was now prepared to "vacate the murder conviction," defendant could now waive her affirmative defense and testify that she had stabbed Hus.

During the motion for reconsideration, the PCR judge also clarified that he had denied defendant's PCR petition on all other grounds except for the failure to communicate the eighteen-year plea offer. In addition, the judge stayed the grant of the petition pending the State's appeal.

On September 30, 2022, the State appealed from the August 31, 2022 order granting the petition. The PCR judge submitted a written amplification of the reasons for his ruling. The amplification clarified that the judge had found (1) Kaigh had never shown defendant the March 8, 2013 letter; and (2) the failure to communicate that letter with the plea offer constituted ineffective assistance of counsel satisfying the first prong of the Strickland test. The amplification letter also explained the judge's reasoning for finding the second prong of the Strickland test. The PCR judge reasoned: "That failure to communicate caused a change in the outcome of this case because the deficiency led to defendant's sentence of [thirty] years without the possibility of parole compared to the plea offer of [eighteen] years subject to NERA." Finally, the court summarized its reasoning on why it could now accept defendant's plea to aggravated manslaughter. In that regard, the court believed that,

> there would be no contradiction or perjury in the plea of first-degree aggravated manslaughter for [defendant], as compared to the contradictions in Alvarez and Taccetta.
> . . . The State was unable to point, with any specificity, to the perjury that would result if the defendant were to enter a guilty plea to [a]ggravated [m]anslaughter.

## II.

On this appeal, the State makes two arguments:

21

POINT I:  THE COURT BELOW ERRED BY GRANTING DEFENDANT'S PETITION FOR POST-CONVICTION RELIEF WHEN DEFENDANT FAILED TO ESTABLISH THAT HER COUNSEL WAS DEFICIENT OR THAT SHE WAS PREJUDICED, NOR IS DEFENDANT ENTITLED TO THE REQUESTED RELIEF OF REINSTATEMENT OF THE PLEA OFFER WHEN SHE CANNOT ENTER A VALID GUILTY PLEA TO THE ELEMENTS OF [AGGRAVATED] MANSLAUGHTER GIVEN HER TESTIMONY AT TRIAL AND AT THE PCR EVIDENTIARY HEARING.

A.  The Court Below Erred By Granting Post-Conviction Relief Because Defendant Failed to Demonstrate Her Counsel Was Deficient Or That She Was Prejudiced By Counsel's Advice Regarding The Plea Offer.

B.  The Court Below Erred By Holding Defendant Established Prejudice Under Strickland, And The Remedy Defendant Seeks of Reinstatement Of the Plea [Offer] Is Precluded As A Matter of Law Because Based On Her Trial And Evidentiary Hearing Testimony, She Cannot Establish A Factual Basis For Every Element Of Aggravated Manslaughter.

POINT II:  THE COURT BELOW ERRED BY DENYING THE STATE'S MOTION FOR RECONSIDERATION BECAUSE THIS COURT'S DECISION IN STATE V. ALVAREZ ISSUED FOLLOWING THE GRANT OF DEFENDANT'S PETITION FOR POST-CONVICTION RELIEF DEMONSTRATES THAT DEFENDANT CANNOT ESTABLISH THE PREJUDICE PRONG OF STRICKLAND, NOR DOES HER TESTIMONY SUPPORT AN ADEQUATE FACTUAL BASIS FOR

22

A GUILTY PLEA TO AGGRAVATED MANSLAUGHTER.

A.    The Right to Effective Assistance of Counsel.

"The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution both guarantee an accused in a criminal prosecution the right to the effective assistance of counsel." State v. Taccetta, 200 N.J. 183, 192-93 (2009) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); State v. Fritz, 105 N.J. 42, 58 (1987)). The right to effective counsel "extends to the plea-bargaining process." Lafler v. Cooper, 566 U.S. 156, 162 (2012); see also Taccetta, 200 N.J. at 193-94.

To establish a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong Strickland test: (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687; accord Fritz, 105 N.J. at 58 (adopting the Strickland two-prong test).

In the context of the plea process, to satisfy the first Strickland prong, defendant must show that her trial counsel was deficient by either not advising her of a plea offer or advising her to reject a plea offer based on an erroneous view of the law. See Missouri v. Frye, 566 U.S. 134, 145 (2012); Lafler, 566

U.S. at 163. The United States Supreme Court has noted "an erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance." Lafler, 566 U.S. at 174.

To satisfy the second prong of the Strickland standard in the context of the plea process, defendant must show that,

> but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.
>
> [Id. at 164.]

In other words, defendant must show that (1) she would have accepted the plea offer; (2) the trial court would have accepted her plea; and (3) her sentence under the plea offer would have been less than her sentence following her conviction at trial.

If a defendant shows ineffective assistance of counsel was the cause of the rejection of a plea, the remedy can include requiring the State to reoffer the plea. See id. at 174. The United States Supreme Court has explained that implementing that remedy involves a PCR court exercising discretion "in

A-0343-22

determining whether to vacate the conviction[] and resentence [defendant] pursuant to the plea agreement, . . . or to leave the conviction[] and sentence from trial undisturbed." Ibid.

Our Supreme Court has clarified, however, that a defendant cannot take a plea offer that would involve the defendant lying under oath to plead guilty to the offered offense. Taccetta, 200 N.J. at 195-96. In Taccetta, the Court found "as a matter of law, that [the] defendant could not have entered a plea of guilty to the purported plea proposal" because a defendant "does not have the right to commit perjury in giving a factual basis for a crime that he [or she] insists he [or she] did not commit." Id. at 194. The Court explained, "[i]n the constellation of our values, it is intolerable for a court to be complicit in accepting a guilty plea from a defendant protesting his [or her] innocence." Id. at 196. Accordingly, the Court in Taccetta held that the defendant could not plead guilty to aggravated manslaughter because, even after trial and at the PCR hearing, the defendant insisted that he was innocent of any involvement in the murder of the victim. Id. at 198.

We have clarified that the rule laid down in Taccetta is not dependent on whether a defendant expressly admits that he or she will lie in accepting a guilty plea. Instead, the rule applies where a defendant has testified at trial but later

wants to repudiate that testimony to accept a plea offer that would reduce the sentence imposed after trial.  See State v. Alvarez, 473 N.J. Super. 448, 461 (App. Div. 2022).  We have explained that after a defendant has testified at trial maintaining his or her innocence, he or she cannot plead guilty to a crime that is inconsistent with the defendant's trial testimony.  Ibid.

We have also explained that even when the defendant has given "multiple inconsistent statements under oath," a court cannot accept a change in a defendant's trial testimony because what a court must presume is the truth "is based on [the] defendant's sworn trial testimony."  Id. at 462.  In other words, when a defendant has proceeded to trial and testified to facts that would not support a subsequent guilty plea, a court cannot accept that guilty plea.  Ibid. As the Supreme Court in Taccetta explained:  "Our court rules and case law require a factual basis for a plea of guilty, that is, a truthful account of what actually occurred to justify the acceptance of a plea. . . . It is an approach that is essential to the very integrity of our criminal justice system."  200 N.J. at 198.

Applying these principles to the record before us, we hold that there are insufficient facts to support the finding that defense counsel failed to show the March 8, 2013 plea offer letter to defendant.  We also hold, as a matter of law,

that a court cannot accept defendant's plea to aggravated manslaughter given her testimony at trial and at the PCR evidentiary hearing.

### B.    Prong One:  The Deficient Performance of Trial Counsel.

The PCR judge found that defendant's trial counsel had been deficient in failing to show her and her family the March 8, 2013 letter offering a plea to aggravated manslaughter with a recommended sentence of eighteen years subject to NERA.  That finding is not supported by credible evidence in the record.

We are mindful that ordinarily an appellate court "is necessarily deferential to a PCR court's factual findings based on its review of live witness testimony" at an evidentiary hearing.  State v. Nash, 212 N.J. 518, 540 (2013).  Nevertheless, we can reject findings when they are "so plainly unwarranted that the interests of justice demand intervention and correction."  State v. Johnson, 42 N.J. 146, 162 (1964); see also State v. Jarbath, 114 N.J. 394, 410 (1989) (explaining that "[t]here is no question that since State v. Johnson, when an appellate court finds an abuse of discretion, it has the power to make new fact-findings"); State v. Holland, 449 N.J. Super. 427, 434 (App. Div. 2017).

Initially, we note that defendant did not argue at the PCR hearing that her trial counsel was deficient in failing to show her the March 8, 2013 letter.  That

letter was never shown to defendant or any of defendant's witnesses at the hearing. Instead, the letter was first introduced on the third day of the hearing by the State during the testimony of the assistant prosecutor who tried the case.

More fundamentally, in her verified PCR petition, defendant conceded that she was aware that the State had offered her the opportunity to plead guilty with a recommended sentence of eighteen years. In that regard, in her verified PCR petition, defendant certified: "Mr. Kaigh urged [defendant] to reject without explanation an [eighteen-]year plea offer with the State and instead take her case to trial on the grounds that at the time of [Hus'] stabbing, [defendant] was suffering from Battered Woman Syndrome." So, in filing for the PCR, defendant acknowledged that she was aware of an eighteen-year plea offer and she argued that her trial counsel was ineffective in advising her not to accept that offer. The PCR judge, however, did not find that trial counsel was ineffective in recommending that defendant not accept the plea offer; rather, the PCR judge found that defense counsel was ineffective in not communicating that offer. That finding is not supported by the record.

In addition, the PCR court's finding is based on speculation. Because defendant was never shown the March 8, 2013 letter, there is no testimony that defendant had not been shown the March 8, 2013 letter. More importantly, we

28

do not have an explanation of how she was aware of an eighteen-year plea offer but the failure to communicate that in a particular letter amounted to ineffective assistance of counsel.

In short, the record does not support that defendant established the first prong of the Strickland test. Normally, we would remand for a new PCR evidentiary hearing. Moreover, if we were to remand, that hearing would need to be conducted by a different judge because the PCR judge who conducted the hearing in 2021 has already formed a view on the outcome of this matter. A remand, however, is not necessary, because defendant cannot prove the second prong of the Strickland test as a matter of law.

C.    Prong Two: Prejudice.

To establish prejudice, defendant needs to show that she would have pleaded guilty to aggravated manslaughter and that the trial court would have accepted that plea. Initially, we note that even at the PCR evidentiary hearing, defendant provided inconsistent testimony concerning whether she would have accepted the plea offer. When first asked about the plea offer with a recommended sentence of eighteen years subject to NERA, defendant testified that she "never said [she] would have taken a plea." Later, she testified that she would have accepted the plea offer if her family recommended it. Nowhere,

however, did defendant clearly testify that in February or March of 2013, she would have agreed to plead guilty to aggravated manslaughter with a recommended sentence of eighteen years subject to NERA.

Here again, however, we need not remand for a new PCR evidentiary hearing because we hold defendant cannot plead guilty to aggravated manslaughter given her testimony at trial. To plead guilty to aggravated manslaughter, defendant would have to testify under oath that (1) she caused Hus' death; (2) she did so recklessly; and (3) she did so under circumstances manifesting extreme indifference to human life. N.J.S.A. 2C:11-4(a); Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter," at 6.

At trial, defendant testified that Hus' death was an accident. More particularly, she testified that none of her actions caused Hus' death. While she acknowledged that she picked up a knife, she testified that she was justified in doing so because she felt threatened by Hus. More importantly, in terms of her own conduct, she testified that she simply held the knife by her side and that she did not engage in any stabbing motion towards Hus. Instead, she testified that Hus slipped on liquid on the floor and "he stumbled" onto the knife.

At the PCR hearing, defendant expressly confirmed that her testimony at trial was truthful:

> Q  So did you testify to the jury that those things were true, or let me rephrase that. Did you testify to those things because these are events that actually took place?
>
> A  Yes.

Defendant also testified: "See, I never admitted to stabbing him because I didn't stab him. . . . Well, I—it was an accident."

To now plead guilty to aggravated manslaughter, defendant would have to repudiate that testimony. She would have to claim that she was not justified in holding the knife and that she was aware of and consciously disregarded a substantial and unjustifiable risk that her conduct could have caused Hus' death.

Moreover, defendant would now need to admit that she did stab Hus and, even if not intentionally, she did so recklessly. Given her testimony at trial and at the PCR hearing, a court could not accept a guilty plea to aggravated manslaughter from defendant because a court could not rely on that testimony as being truthful.

We make the last point about the unreliability of defendant's testimony because this record is clear that defendant has changed her version of events concerning Hus' death multiple times. Defendant's argument at this point would

31

have to be that she was lying at trial, and that she is now willing to admit that perjury and offer yet another version of how Hus came to be stabbed. In Taccetta, the Court recognized that there will be times when an accused may enter a plea of guilty to a crime that he or she did not commit to insulate himself or herself from a "potentially greater sentence if found guilty by a jury." 200 N.J. at 198. Nevertheless, the Court made it clear that such a plea cannot be accepted if the court is aware that the defendant is lying. In this matter, only defendant can say what truly happened in her family's kitchen on September 4, 2010, because only she and Hus were present. What we do know now, however, is that defendant cannot be permitted to change her sworn trial testimony after she received a fair trial in an effort to reduce the mandatory minimum sentence imposed following the jury's conviction on the murder charge.

In summary, we hold that there is insufficient evidence supporting the PCR judge's finding on prong one of the Strickland test. We also hold that, as a matter of law, defendant cannot show prejudice under prong two of the Strickland test because her testimony at trial precludes her from testifying to the elements of a plea to first-degree aggravated manslaughter. Accordingly, we reverse and vacate both the August 31, 2022 and the September 28, 2022 orders. Defendant's convictions and sentence remain in place.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0343-22